**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Wally HOLLY, Defendant–Appellant.**

No. 98–1248.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1999.

Decided Feb. 11, 1999.

Susan E. Cox, Office of the United States Attorney, Criminal Division, Chicago, IL, Virginia M. Kendall (argued), Office of the

United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Paul M. Brayman, Chicago, IL, James D. Riddet, Stokke & Riddet, Santa Ana, CA, William J. Kopeny (argued), Kopeny & Powell, Irvine, CA, for Defendant–Appellant.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Wally Holly was the brains behind a cruel plot to kill a show horse in order to collect insurance money. He and Freddy Vasquez, Jr. were charged with participating in a scheme to defraud an insurance company in violation of the federal mail fraud statute, 18 U.S.C. § 1341. Vasquez entered a guilty plea and Holly was convicted following a jury trial. Holly appeals his conviction, claiming that two evidentiary rulings deprived him of a fair trial. His first issue concerns the admission of testimony regarding his past physical abuse and threats toward some of the witnesses; the second issue involves the admission of an out-of-court statement by one of the witnesses.

Holly was a horse trainer who, with his former wife Kay Feldmar, ran Tuckaway Farm in Long Grove, Illinois, from 1987 to 1989. Vasquez, then a teenager who trained horses for competitions, rode at Tuckaway. During this time, Holly sold Vasquez a horse named Arlene, a chestnut mare trained to be a show horse. Unfortunately, especially for her, Arlene turned out to be a big disappointment.

In 1989 Holly and Feldmar separated. Holly moved on to Perfecta Farms and in with its owner, Kim Gardiner. Freddy also began to ride at Perfecta, where he kept Arlene in one of the farm's 70 horse stalls. Everyone was frustrated by Arlene's lack of progress, and a fair inference from the evidence is that Holly concluded that Arlene, carrying $15,000 in insurance, was worth more dead than alive. With Arlene dead, and $15,000 in hand, Holly could sell another horse to Vasquez—a good deal for both of them but not such a good deal, obviously, for Arlene.

On a January day in 1991 the plot came to fruition. Holly schooled Vasquez on how to swing a crowbar and break Arlene's leg so it would look like an accidental injury. That sort of injury, Holly knew, would require that Arlene be put to death. In doing the dirty deed, Holly put a towel over Arlene's head and Vasquez did as he was taught, whacking the horse hard across the left front leg. Holly then ordered Gardiner to call the veterinarian and tell him that the horse had been injured while jumping. Gardiner hesitated and Holly threatened her by slamming a telephone handset against her head. Gardiner then did as she was told. The vet put Arlene to sleep and the phony insurance claim was filed.

Holly ordered Gardiner to lie to the insurance company about the injury. She told the company that Arlene was accidentally injured, even though she knew her statement was a lie. Later, Holly threatened that if she ever told the truth to anyone he would burn down her barn. Fearful, she also lied to FBI agents when they interviewed her about the circumstances surrounding Arlene's death.

Two other women who worked at the farm—Bonny Alexander and Ginger Jensen—also knew that Arlene was intentionally hurt, but they also remained silent because they were afraid of Holly. Alexander was the barn manager on the day Arlene was killed. She was told to tell the veterinarian and the insurance company that Holly was not at the farm on the fateful day, a story she also repeated to the FBI. She lied despite seeing Holly leave the stall with a metal bar on the day Arlene was killed.

Jensen heard the cries from Arlene after she was struck so she went to the barn to investigate what was going on. At that time, as had Alexander, she saw Holly walking to the tool room carrying a large metal bar. Shortly after the injury, Holly instructed Jensen to say he was not at the farm that day. Out of fear, she told that lie to the FBI and later to the grand jury. Both Jensen and Alexander testified at trial about the events we have just described. In addition, at trial, Vasquez, who had entered a guilty

plea, testified regarding Holly's plan and the blow he struck to Arlene's leg.

■ Holly would be happier if he could have used the prior statements of the witnesses to the effect that Holly was not involved in the crime, without any explanation to the jury about why the witnesses had lied. But he did not receive that advantage. Before trial, in response to the government's motion pursuant to Rule 404(b) of the Federal Rules of Evidence to admit the evidence of intimidation, the district judge asked Holly's counsel: "Do you intend when examining [Gardiner, Jensen, and Alexander] to elicit their prior statements?" Counsel said "yes." With that, the judge granted the government's motion to present the evidence in its case-in-chief, a ruling which we review for an abuse of discretion. *United States v. Hughes*, 970 F.2d 277 (7th Cir.1992).

■ From several perspectives the admission of the testimony was not an abuse of discretion. First of all, it is the law of this circuit that the government is allowed to "front" the expected cross-examination of witnesses. *See United States v. Robinzine*, 80 F.3d 246 (7th Cir.1996). Defense counsel, as we just noted, clearly indicated that he intended to use the witnesses' prior statements. He cannot be heard to argue now that, because he *might not* have used the statements, it was error to let the government "front" the evidence. The district court correctly reasoned that the evidence explained why the witnesses gave stories that did not incriminate Holly.

■ Holly also argues that if the impeachment evidence was to be admitted, it should have been limited to general testimony and should not have included details. However, Holly never requested that the testimony be limited, and furthermore, in some instances details were elicited in response to his request for foundation testimony. For example, when Gardiner was asked whether Holly had ever physically abused her, counsel asked, "Can we get a date please?" In response to which Gardiner proceeded to describe an incident in which she got the wrong kind of popcorn for Holly and he threw the popcorn and a book at her, hitting her in the eye.

Because the evidence was properly admitted, there is no need for us to conduct a harmless error analysis. Nevertheless, in order to put the evidence in context, we will briefly outline the overwhelming evidence against Holly in this case. Vasquez testified directly about the insurance fraud scheme. He testified that Holly was in the stable with him when the horse was injured. He admitted swinging the bar at the horse's leg at Holly's direction. In addition, there are tape-recorded conversations between Vasquez and Holly, years later, in which Vasquez sought advice about what he should say to the FBI and in which he said he followed Holly's directions and told the FBI "the whole cover story thing." Vasquez's father testified that his son confessed the events to him and that Arlene was not insured until Holly and Gardiner suggested that she should be. Also, Gardiner testified that Holly previously had discussed injuring the horse. And although Gardiner urged Holly to find another way to deal with the horse, Holly told her to tell Vasquez and his father to get the horse insured. Jensen and Alexander also testified about their knowledge of the events. Finally, Kay Feldmar testified that she had discussed various similar cases—"horse trials"—with Holly, and at Holly's instruction she had told Vasquez to lie to the FBI. The evidence against Holly was nothing short of overwhelming.

■ The other evidentiary ruling which Holly claims was erroneous was the admission of Gardiner's testimony that on the day the horse was injured, Jensen returned from the stables crying and stating, "They broke that mare's leg." The statement was originally admitted, properly in our view, to show Gardiner's state of mind. That does not answer whether it could be used directly against Holly. However, at the end of the evidence the district court also ruled that Gardiner, Jensen, Feldmar, and Alexander were members of the conspiracy and that the statement was therefore admissible as a statement of a coconspirator pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence. We find no error in that ruling.

Also undermining Holly's contentions on this point is the fact that the government never argued that the statement proved the truth of the matter—that is, that, in fact, Holly had Vasquez break the horse's leg. Accordingly, the judgment of the district court is AFFIRMED.