In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3171

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSE SOLIS JORDAN,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 814--Blanche M. Manning, Judge.


Argued April 13, 2000--Decided August 17, 2000


  Before FLAUM, Chief Judge, and HARLINGTON WOOD, JR.
and DIANE P. WOOD, Circuit Judges.

  HARLINGTON WOOD, JR., Circuit Judge.  The ten
issues on appeal range from the voluntariness of
the defendant's confession to "colonialism."
Except for the defendant's assertion that, as a
colonial power, the courts of this country lack
jurisdiction to try a citizen of Puerto Rico who
has been charged with four related federal crimes
committed in this country, there is nothing
unusual about the other issues except for the
context in which they arise. The defendant-
appellant, Dr. Jose Solis Jordan ("Solis"), is a
professor of educational philosophy at the
University of Puerto Rico, San Juan, Puerto Rico,
but was residing in Chicago, Illinois at the time
of the alleged offenses. He was charged for his
role in the bombing of a military recruitment
center in Chicago, with one count of conspiracy
to commit offenses against the United States in
violation of 18 U.S.C. sec. 371, two counts of
attempted destruction of government property in
violation of 18 U.S.C. sec. 844(f), and one count
of illegal possession of explosives in violation
of 26 U.S.C. sec. 5861(d).
  The defendant was found guilty on all counts by
a jury on July 13, 1999. Before examining the
specific issues, we will set them in an
evidentiary context. The defendant argues, among
other things, that the evidence was insufficient
to prove his involvement.

I.  BACKGROUND

   The story begins in 1992 when Jose Lopez, the head of Chicago's Puerto Rican Cultural Center ("PRCC"), asked Rafael Marrero to form a clandestine political organization advocating independence for Puerto Rico from the United States to be accomplished, if necessary, by violent means. That organization came to be known as the Frente Revolucionario Boricua/1 ("FRB"). Beginning in 1988, Marrero worked at the Puerto Rican Alternative High School in Chicago. He had joined the Movimiento de Liberacion Nacional/2 ("MLN") which was already advocating Puerto Rican independence. Marrero was a member of MLN's propaganda endeavors under Lopez. The objectives of MLN were to promote Puerto Rico's independence from the United States, but also to secure the release by the United States of individuals referred to as "political prisoners." The "political prisoners" were those individuals who had been convicted in federal court of acts of violence against the United States government. Their convictions, among other things, were for armed robbery, attempted kidnapping, and bombing of government facilities, all claimed to be an effort to gain independence for Puerto Rico.

   According to Marrero, he and Lopez began discussing the use of violence in their political efforts. Lopez told Marrero that an "experiment" had been approved at the highest levels of the MLN to "test the waters" with violence to see if it would cause a positive reaction in favor of the "political prisoners." The target to be chosen would be a military, government, or financial institution. Lopez instructed Marrero to contact Dr. Solis.

   Marrero had met Dr. Solis in 1989 at an MLN-sponsored protest march in New York. They became better acquainted when Dr. Solis moved to Chicago in 1991. Lopez told Marrero that Dr. Solis could be trusted. Dr. Solis had pressed Lopez on the use of violence to achieve Puerto Rican independence, inquiring why violence had not been used previously. Marrero and Dr. Solis, according to Marrero's testimony, began to discuss political targets, with Dr. Solis suggesting the use of a bomb. Recruiting others to help was discussed. Dr. Solis advised that the FRB's membership should not exceed five in order to avoid suspicion. Dr. Solis recommended his wife be selected as one of the five, but Marrero instead recommended two others as recruits, Edward Brooks and Diana Vasquez, both supporters of the Puerto Rican independence movement. Brooks was already acquainted with Dr. Solis as they had worked together on the radio to raise public

awareness of the Puerto Rican "political prisoners" and Puerto Rican independence. Brooks later testified at trial that the FRB was to plan for some type of violent and illegal act.

In the spring of 1992, the FRB had its first meeting. Marrero explained the FRB's purpose. Dr. Solis emphasized secrecy. The meetings continued from time to time. Dr. Solis demonstrated technical knowledge about bomb construction and became the group's instructor. He provided manuals and other materials along with illustrations to explain the bomb manufacturing process. Dr. Solis made some small test bombs of different kinds from different materials, being careful not to leave fingerprints on the parts. Marrero testified that Dr. Solis had constructed a pipe bomb which he tested in a Chicago-area forest preserve. Based on Dr. Solis's knowledge and experiments, he recommended to the group that a time-delay pipe bomb be made and used.

Marrero testified that the plans for the actual bombing then proceeded. The date of July 25, 1992, was first chosen because it was the anniversary of the initial landing of United States troops in Puerto Rico, but that date came and went. October 12, 1992 was then chosen because it was the 500th anniversary of Columbus's landing in this hemisphere. Specific bombing sites were discussed, including the Dirksen Federal Building (which houses this court), but it was considered too difficult. The Citibank building in Chicago was then surveilled as a possible target. It was claimed the bank had taken advantage of the Puerto Rican people./3 Plans for the bank site advanced to the point where Dr. Solis sketched the bank building and drafted a "communique."/4 The communique was to be left at the bomb site so the public would know that the bombing was in support of Puerto Rican independence. However, that plan was abandoned as the group broke ranks. Brooks withdrew from the FRB both because he was under pressure from his girlfriend and because he was not personally enthusiastic about the use of violence. After Brooks's departure, the others decided they should continue anyway, but with a new target. It was Dr. Solis, Marrero testified, who suggested the new target, a particular military recruiting office in Chicago. The basis for the recommendation of Dr. Solis was that the recruiting station was secluded and had no security cameras. The group's bombing plans then went ahead, concentrating on the recruiting station.

With the planning and testing complete, Dr. Solis, Marrero, and Vasquez prepared for the actual bombing. The new date was to be December

10, 1992, International Human Rights Day. After surveilling the recruiting station, they decided to place one pipe bomb in front of the recruiting station and another under a government car at the site. The bombs would be placed late at night so they would detonate early in the morning. Dr. Solis would do the driving and Marrero and Vasquez would plant the bombs and leave the communique. This routine was rehearsed several times. The communique to be left at the site was drafted by Dr. Solis and Marrero. Marrero and Dr. Solis constructed the two bombs at Dr. Solis's home using propane tanks, pipes, gun powder, clocks, and other materials.

On the night of December 9, 1992, Dr. Solis picked up Marrero and returned to Dr. Solis's home for the bombs, then picked up Vasquez at her home. Riding in the back seat, Marrero placed the battery caps on the devices to activate them. Then, however, he suffered a change of heart and began attempting to disarm the bombs by removing the battery caps. Upon arrival at the recruiting station, Dr. Solis waited in his car while Marrero placed one bomb in front of the recruiting station and Vasquez placed the other bomb under a nearby government car, all as planned. Two communiques were posted nearby. Dr. Solis, Marrero, and Vasquez then drove away, dropping Vasquez at home. Dr. Solis placed an anonymous phone call so the FRB would get appropriate credit for the bombing. He also sent a copy of the communique to the PRCC to be forwarded to the "political prisoners." There must have been great disappointment the next morning, however, considering all their planning and preparation. Although it damaged the government car, the bomb only burned without fully exploding. The other bomb placed in front of the recruiting station was disarmed by a police officer who arrived at the scene.

Dr. Solis's response to this evidence, which he claimed to be insufficient to prove his participation, is succinctly summarized in his brief.

Jose Solis Jordan did not destroy government property. He did not possess an explosive device. He did not conspire with Rafael Marrero to set devices by an army recruiting center. Dr. Solis is a scholar, an intellectual and a man of integrity.

Appellant's Brief at 32.

We shall interrupt the story at this time to take up Solis's claim of insufficiency of the evidence, having just set out the pertinent facts, and will then proceed to examine what

occurred after the bombing and the remaining nine issues.

Our standard of review does not require that we ignore the government's evidence and resolve all credibility issues and inferences in favor of the defendant. Under our standard of review, we will "affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime." United States v. Masten, 170 F.3d 790, 794 (7th Cir. 1999) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In United States v. McVeigh, the Murrah Federal Building bombing case in Oklahoma City, the Tenth Circuit stated the rule, "On appeal, we review the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government." 153 F.3d 1166, 1176 n.1 (10th Cir. 1998), cert. denied, 526 U.S. 1007 (1999) (citing United States v. Copus, 110 F.3d 1529, 1534 (10th Cir. 1997)). Even without such a high hurdle for a convicted defendant to clear, there can be little doubt that the evidence of Dr. Solis's guilt, which speaks for itself, is more than sufficient and deserves no further comment. We reserve for the moment, however, the other issues raised by Dr. Solis relating to the evidence.

We now return briefly to the factual developments. Over two years after the unsolved bombing, Marrero agreed to cooperate with the FBI, not only in this case but in others. In the meantime, Dr. Solis had moved back to Puerto Rico with his wife, Martha Gonzales. Marrero, now cooperating with the government, met Dr. Solis and his wife in a San Juan restaurant and covertly tape recorded their dinner conversation. Marrero advised them that the FBI had been making some inquiries. (Those tape recordings are a separate issue which will be discussed later.) There was some discussion of the applicable statute of limitations for murder, so it was a serious "bombing" discussion. There was also interest expressed about any reactions of the "political prisoners." On an early morning in November of 1997, Dr. Solis was arrested by FBI agents at his home in Puerto Rico and later transported to Chicago for trial./5

Other pertinent evidence will be discussed in relation to the particular issues.

II.  ANALYSIS OF THE ISSUES
A.  Alleged Request for an Attorney

After his arrest in Puerto Rico, Dr. Solis signed a waiver of his Miranda rights and substantially admitted his participation in the

bombing plot as recited above. Dr. Solis now maintains that, because he repeatedly requested an attorney prior to and during his interrogation, his confession was not voluntary and should have been suppressed. "[T]he ultimate question of whether a confession is voluntary is a matter of law that must be reviewed de novo in this court. Nevertheless . . . the determination of the historical facts of the case are the proper domain of the trial court and [ ] our review of its finding in that regard will be for clear error." United States v. D.F., 115 F.3d 413, 419 (7th Cir. 1997) (footnote omitted).

Dr. Solis's admissions after his arrest generally covered his initial contacts with his associates, the construction of the bombs, and his role in the actual bombing, and were set forth in an FBI report. Dr. Solis and his wife Martha, however, testified otherwise at his trial. She, nevertheless, conceded they both were ardent supporters of Puerto Rican independence and the "political prisoners." She also admitted that her husband believed in the right to use violence against the United States. During a difficult cross-examination, when it appeared that Gonzales was being impeached, she became evasive and defensive of her husband. Dr. Solis, as we have mentioned, denied any complicity.

It was claimed that Dr. Solis requested counsel at the time of his arrest, but the testimony varied considerably. Dr. Solis testified he had asked his wife in Spanish to call a lawyer for him as he was being arrested and that, also in Spanish, he told the agents as he was being taken away that he wanted to see an attorney right away. The agents present during the arrest, most of whom were Spanish-speaking, denied having heard Dr. Solis give such an instruction to his wife, or make any request for an attorney in either Spanish or English. After his arrest, Dr. Solis was taken to FBI headquarters in San Juan where he was photographed and fingerprinted. This process for a major case took about one-and-a-half to two hours. An agent who had been with Dr. Solis from the time of his arrest through the booking process, described Dr. Solis as "very cooperative, very friendly, relaxed," and cordial all day. Dr. Solis, the agent testified, spoke only in English and did not ask for an attorney. Following the booking process, three government agents began an interview with Dr. Solis at about 9:30 a.m. The agents explained to Dr. Solis why he had been arrested and informed him of his rights, with one of them reading his Miranda rights to him using the FBI's standard "Advice of Rights." Dr. Solis was then asked to read the rights statement form for himself, which he did. After that, one of the agents testified Dr. Solis

signed the form, which stated, "At this time, I am willing to answer questions without a lawyer present." The two other agents signed the form as witnesses. Dr. Solis then proceeded to relate many of the facts about his role in the bombing. At about 11:15 a.m., the agents learned a lawyer named Rafael Anglada had arrived at FBI headquarters who advised them he was Dr. Solis's lawyer. The agents asked Dr. Solis if he had ever heard of Anglada. They testified that Dr. Solis responded he had never heard the name before, that he was not his attorney, that Anglada did not represent him, that he did not wish to speak to Anglada, and that he did not have a lawyer. Although the agents testified that Dr. Solis had not asked for a lawyer at any time, shortly after the inquiry from Anglada, the interview was terminated and Dr. Solis was taken to Pretrial Services.

  Before trial, Dr. Solis filed a motion to suppress his incriminating post-arrest statements, and the court set his motion for hearing. Dr. Solis testified that he had requested an attorney on numerous occasions during the arrest process. However, all eight FBI agents, most of whom spoke both English and Spanish, who had any substantial contact with Dr. Solis at that time, testified that Dr. Solis never asked for a lawyer. At the conclusion of the motion hearing during which Dr. Solis testified, the district judge denied the motion and specifically found that Dr. Solis had not requested counsel. Dr. Solis admitted signing the waiver form and does not claim he did not understand it. The district court, after noting the educational background and achievements of Dr. Solis, found that Dr. Solis had understood what he was doing. A mistake about the time of signing was corrected and initialed on the form by Dr. Solis. Dr. Solis maintains that the initials were not made by him and that the time difference was critical to show the FBI could not have had time to obtain his lengthy confession. He argues that the agents fabricated the change to make their story of the confession more believable. The alleged time difference was not a sufficient basis for Dr. Solis's counsel to impeach the agents.

  This court does not in the usual circumstances undertake to make credibility findings, as that is better left to the fact finder, be it judge or jury. In any event, there is absolutely not the slightest basis in this case for this court to overturn the district court's credibility findings.

B.  Venue

Dr. Solis objected to conducting his trial in the United States instead of Puerto Rico, where he was working and living with his family at the time of his arrest. He made the necessary motions pursuant to the Federal Rules of Criminal Procedure 21(a) and (b). Under subsection (a) of Rule 21, transfer to another district can be ordered "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." In support of the motion, defense counsel argued that negative pretrial publicity in the local press and existing prejudices against Puerto Ricans in general and against those who support Puerto Rico's independence could be obviated by transfer to Puerto Rico. In Puerto Rico, it was argued, a bilingual Puerto Rican jury could better judge the case which was anticipated would involve disputes about language translations, as in fact it did. It was further argued that a Puerto Rican jury would be free of the prejudice and discrimination against Puerto Ricans. It was also claimed that a Puerto Rican jury could better "judge the case in the context of a history of political persecution and fabricated charges against independentistas."/6 The government defends the court's ruling denying the venue transfer on the basis that the alleged crimes were committed in Chicago, not Puerto Rico, and that most of the witnesses would be from Chicago.

It was explained in the district court that Dr. Solis was not moving separately for transfer under Rule 21(a) on the grounds of pretrial publicity, but wanted the pretrial publicity to be weighed with his Rule 21(b)/7 arguments. In fact, as the district court noted, Dr. Solis conceded that the press reports referenced by him did not entitle him to relief under Rule 21(a). The government claims the defendant, therefore, waived his Rule 21(a) motion. However, we will consider his Rule 21(a) and (b) motions together. In behalf of his 21(b) motion, the defendant claims that in denying his motions, the district court failed to consider the factors set forth in Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 244-45 (1964). Those factors range broadly from the location of the defendant and possible witnesses, to disruption of the defendant's business unless the case is transferred, to the expenses which might be incurred by the parties, the location of counsel, and accessibility of the place of trial, to the docket conditions in the districts involved as well as other special considerations. Id. Those factors which could realistically affect the decision in this case were fully considered by the district court. The government concedes, however, there were factors

on both sides of the issue. The court acknowledged that Dr. Solis and his family resided in Puerto Rico at the time of trial and that a Chicago trial would "impose extreme economic, emotional and logistic hardship on the defendant and his entire family." The court also noted that while the defendant "posits" that many witnesses will be Puerto Rican, Dr. Solis failed to specify who the Puerto Rican witnesses would be and what their testimony would relate to. The court took note of the fact that, because Dr. Solis's motion for additional counsel was granted by the court, he now had both a Puerto Rican attorney and a Chicago attorney, alleviating problems Dr. Solis raised concerning language and knowledge of Puerto Rico. Dr. Solis's Puerto Rican counsel and his Chicago counsel both represented Dr. Solis at trial and argued this appeal. His Puerto Rican counsel was not the same counsel who appeared at the time of Dr. Solis's arrest in Puerto Rico claiming to be his attorney.

Our standard of review for this issue is for an abuse of discretion. United States v. Robinson, 20 F.3d 270, 275 (7th Cir. 1994). This court observed that the consideration of a Rule 21(b) motion "is one of those areas in which the question for the court of appeals is whether the discretion granted to the district court has been exercised. If it has been, it will be almost impossible to show that it has been abused . . . ." Matter of Balsimo, 68 F.3d 185, 187 (7th Cir. 1995). We cannot say, considering all the arguments advanced, that the district judge abused her discretion by requiring the trial to be held in the district where the alleged crimes were committed. Venue is not the defendant's choice to be determined on the basis of where he believes a jury might be more sympathetic to his political views. The district judge considered what needed to be considered and, after weighing those factors, kept the trial in Chicago. We see no abuse of discretion.

C.  Peremptory Challenges

Next, the defendant raises a jury issue claiming the government was permitted to peremptorily excuse two Latino venirepersons without sufficient justification./8 That justification is needed to show that the government's peremptory challenges are not motivated by purposeful discrimination, and in effect were not pretextual. Batson v. Kentucky, 476 U.S. 79, 100 (1986).

Contrary to what the defendant argues by relying on Mahaffey v. Page, 162 F.3d 481, 484 (7th Cir. 1998), our standard of review is not de

novo. The standard of review remains as set forth in United States v. Williams, 934 F.2d 847, 849 (7th Cir. 1991), which states that the appellate court "will only overturn the trial court's determination that a prosecutor's use of peremptory challenges was not motivated by purposeful discrimination if that determination is clearly erroneous." Mahaffey applies to a different Batson situation. Normally, a Batson review involves three stages: (1) a prima facie showing of discrimination must be made by the defendant, (2) with a prima facie showing, the prosecution must present a race-neutral explanation for striking the jurors, and (3) the trial court must decide whether the prosecution's reasons are pretextual and whether the defendant has proven purposeful discrimination. Mahaffey, 162 F.3d at 482-83 (citing Batson, 476 U.S. at 96-98). In Mahaffey, the court never proceeded beyond the prima facie determination; therefore, because the question of whether a prima facie case has been shown presents mixed questions of fact and law, a de novo review must be conducted. Id. at 483, 484. The court in Mahaffey held that because Mahaffey made a prima facie showing, the State was required to present race-neutral explanations. Id. at 486. The state judgment in that habeas corpus case was therefore reversed and remanded for a new Batson hearing to allow the State to advance any race-neutral explanations for the challenged strikes. Id.

In the present case, however, the government did advance its race-neutral explanations at the time the issue was raised. The trial court accepted the government's explanations. Two male Latino jurors had been peremptorily excused. The first juror was excused, the government explained, because the particular juror's wife taught Spanish at DePaul University in Chicago where Dr. Solis and some of his possible character witnesses had also taught. It was also claimed that at DePaul there was a "hotbed of dissent regarding the defendant."

One of the government's objections to this juror was that he was fluent in Spanish, but had difficulty with English. The government expressed the concern that the juror might refuse to defer to the government's translations of what it was that Dr. Solis may have been heard to say on the controversial tapes (problems which did develop and will be discussed later). The district court did not accept this explanation, because the government failed to question the Spanish-speaking venirepersons about their willingness to defer to expert witnesses' translations of the tape. We agree with the district court on this particular point. Under the plurality opinion authored by Justice Kennedy in Hernandez v. New

York, 500 U.S. 352 (1991), it appears to us that the key question is whether the prospective juror would be willing to follow the court's instructions and thus be willing to defer to the authorized translation. The plurality went out of its way to avoid suggesting that bilingualism itself is a race-neutral ground for striking a juror. Id. at 361. Thus, the government's failure to ask how the jurors would react to the testimony was an important omission.

As to this juror, the district court found, however, that the juror's wife taught Spanish at DePaul and that, further, Dr. Solis's case was being hotly debated in her department. The court also noted that this juror had had some bad experiences with the military in Argentina. Relying on our Williams standard of review, we see no peremptory challenge Batson error. We have in other cases approved reasons given by the prosecution that included merely "intuitive assumptions that are not fairly quantifiable." Williams, 934 F.2d at 850 (quoting United States v. Briscoe, 896 F.2d 1476, 1489 (7th Cir. 1990)). In Williams, this court found that the explanations for challenge were credible and, given the deference due the trial court, could not say, based on the record, that the ruling was clearly erroneous. Id. The same is true in the present case. Based on the record and in view of the government's explanations, we have no basis to hold that the district court's decision was clearly erroneous. That some of the anticipated government testimony, which might have caused difficulty for this juror, never materialized, is irrelevant in that pretrial setting.

The second juror peremptorily excused by the government was also fluent in Spanish but, again, as with the first juror, this was not the court's reason for finding that the peremptory challenge was not tainted. The second juror had done campaign work in two Chicago wards, working for the campaigns of a current alderman and a previous alderman (who at the time of trial was a congressman), both of whom were Hispanic. The government claimed that these two politicians had not only spoken out publicly on numerous occasions against Marrero, who was to be a principal government witness, but had attempted to have Marrero removed from his job. The government also stated that the defense was planning to question Marrero about the attempt to have him removed from his job, which involved one of the politicians. In addition, tapes were to be submitted to the jury on which Marrero made derogatory comments about these two men. The two aldermen had also been disparagingly depicted as "Spice Girls" in a publication associated with Marrero, to which he had contributed articles.

Applying our Williams standard of review in these circumstances, we find no error in the ruling of the district court that both of the peremptory challenges were based on individual bias and not race related. Peremptory challenges have become limited in their use in certain circumstances, but have not been restricted to the point of being equated to challenges for cause. The Supreme Court in Hernandez noted that deference is given to the trial court findings on the issue of discriminatory intent because "the finding largely will turn on evaluation of credibility." 500 U.S. at 365 (internal quotations and citation omitted). The defense arguments about these jurors are not sufficient under our standard of review to fairly characterize the government challenges as race-based challenges. We find no error.

D.    Tape Recordings

Dr. Solis next objects that the tape recording of his and his wife's conversation with Marrero about the bombing and events both before and after, which was made in a restaurant in Puerto Rico on June 28, 1997, should not have been allowed into evidence because it is inaudible. After Dr. Solis was indicted, the government provided him with a copy of the pertinent parts of the controversial tape, together with a transcript in English to serve as an aid to the jury. The defense notified the government in advance of trial that it would dispute the transcript. In response, the government hired an independent court interpreter, Roberto Mendoza, to prepare another transcript of the tape. This new transcript was also provided to the defense. The defense then requested a transcript of the entire tape which would reflect the Spanish language on the tape instead of the English translation of the conversations in Spanish. There was not time to prepare the transcript of the whole tape, and most of the tape was irrelevant anyway. The parties endeavored to agree on a translation of about four minutes of the tape mutually considered to be relevant. The interpreter then prepared transcripts of the relevant portion both in Spanish and in English. Defense counsel made suggestions about the translation, some of which were incorporated into the new transcripts. However, the consensus effort failed and the defense moved to suppress the tapes as inaudible.

In considering the problem with the tapes, the district court judge listened to the tapes in camera, as we have, and found the tapes sufficiently audible, holding that the tapes would be admitted upon government authentication.

Both sides, it was ruled, would be permitted to present their own experts and translations and transcripts. The jury was to be allowed to rely on the transcript it found to be most credible in correctly reflecting the conversations. There could be no fairer way for the district court to present this tape problem for jury consideration. However, during opening arguments, defense counsel suggested to the jury that the government was only going to produce "a snippet" of the conversation, the inference being the government was hiding something or taking the comments out of context. In response, the government offered the transcript of the full tape.

At trial the government called two certified court interpreters, Mendoza and Gloria Domenech, who both testified that the transcript accurately reflected the conversations on the tape. Any inaudible portions, it was explained, were only a matter of a few seconds or fractions of seconds. Although the defendant produced no expert or any other transcript in rebuttal, the burden of proof remained with the government. We held in United States v. Powers, 75 F.3d 335, 341 (7th Cir. 1996) (internal quotations and citation omitted), "A recording that is only partly unintelligible is admissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy." The decision whether to admit a recording with some unintelligible portions is left to the district court's sound discretion. See id. (citation omitted). We continue to follow that standard. United States v. Singleton, 125 F.3d 1097, 1104 (7th Cir. 1997) (holding that district court has broad discretion in deciding whether to allow the use of written transcripts to aid the jury in listening to recorded conversations). If the tape is generally audible, but only partially inaudible, the inaudible portions may affect its weight, a determination to be left to the jury. United States v. Robinson, 956 F.2d 1388, 1395 (7th Cir. 1992). The tape's admissibility, however, is a matter for the court to decide. See Powers, 75 F.3d at 341. Conclusory arguments made by counsel about the tape or transcript inaccuracies, with no indication that the verdict was adversely affected, are not sufficient. United States v. Fuentes-Montijo, 68 F.3d 352, 355 (9th Cir. 1995) (citing United States v. Pena-Espinoza, 47 F.3d 356, 360 (9th Cir. 1995)). We find no clear abuse of discretion by the district court.

E.  Jury Instruction on Tape Recording/Transcripts

The previous section does not dispose of all the tape recording issues as the defense also

objects to the district court's jury instruction regarding the tape and transcripts. Two Seventh Circuit Federal Criminal Jury Instructions are at issue, sec. 3.17--Recordings/Transcripts of Recordings,/9 and sec. 3.18--Foreign Language Recordings/Transcripts in English./10 Defendant requested the two instructions be given separately and in full. The government presented, and the district court accepted, a combination instruction, with sec. 3.18 given in full but combined with sec. 3.17, omitting only duplicative language of sec. 3.17.

Among the exhibits admitted during the trial were recordings that contained conversations that took place partially in the Spanish language. You were also provided with English transcripts of those conversations. The transcripts were provided to you so that you could consider the content of the conversations of [sic] the recordings.

Whether the transcripts contain accurate translations of the Spanish language portions of the recordings in whole or in part is for you to decide. In considering whether a transcript accurately describes the meaning of a conversation, you should consider the testimony presented to you regarding how and by whom the transcript was made. You may consider the knowledge, training, and experience of the translator, as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case.

With respect to the Spanish language portions of the recordings, you should not rely in any way on any knowledge you may have of the Spanish language spoken on the recording. Your consideration of the transcripts should be based on the evidence introduced in the trial.

With respect to the English language portion of the recordings, the tape recordings themselves are the evidence of what was and was not recorded on the tapes. With respect to the English portions, English language portions of the recordings, the transcripts were provided to you solely as a listening aid. If from your hearing of the English portion of a particular recording you perceive any variation between the cassette and the corresponding transcript, you will be guided solely by the cassette and not by the transcript.

Dr. Solis maintains that this jury instruction not only directs the jury to consider the Spanish-language translations as the evidence, not the tape, but that having the written

translation sent into the jury room as evidence unduly emphasizes that portion of the tape.

Effectively combining multiple instructions into one instruction is an accepted practice. United States v. Ashley, 54 F.3d 311, 315 (7th Cir. 1995). We do not see that the combination of instructions misstated the law, omitted any relevant part of the law, or unduly emphasized any part of the evidence. We have held that if the instructions in their entirety are fair, accurate, and sufficient for the jury to have an understanding of the issues to be decided and includes a fair and accurate statement of the law, we will accept the judge's instruction determinations. United States v. Lanzotti, 205 F.3d 951, 956 (7th Cir. 2000). We do not find that the combined instruction misled the jury and believe the instruction provided a clear understanding of the issues and the jury's duty to determine those issues. See id. And so it is in this case, we find no error in the judge's exercise of discretion.

F. Evidence of Government Payments to Marrero

Dr. Solis seeks a new trial on the basis that government counsel in his opening statements advised the jury of the FBI's payments made to Marrero, which were to cover his relocation costs, lost wages, and for Marrero's help in the investigation. Marrero testified that several events occurred which were sufficient for Marrero to believe his life was in danger. Given the factual circumstances of this case, that was not an unreasonable concern. The government spent about $119,000 in relation to Marrero, which the evidence was expected to show, and did show.

Evidentiary rulings of the trial court will be reversed only if there has been a clear abuse of discretion, such that no reasonable person could agree with the district court's ruling. United States v. Adames, 56 F.3d 737, 746 (7th Cir. 1995) (citing United States v. Briscoe, 896 F.2d 1476, 1490 (7th Cir. 1990)). The defense argument seems to be that the government's payment information in its opening statement was premature even though it could be explored in direct and on cross-examination. Defense counsel had indicated in advance that he intended to tell the jury in his opening statement that "[Marrero] was paid over $100,000 for his testimony." That payment information, of course, could have a bearing on Marrero's credibility. Once the defense had indicated it would make a statement about Marrero and the FBI money, the government was entitled to address the issue prior to the defense. See United States v. Holly, 167 F.3d 393, 395 (7th Cir. 1999); United States v. Robinzine, 80 F.3d

246, 252 (7th Cir. 1996). Government counsel was not required to wait for defense counsel to bring up the payments to Marrero. That possibly could have given the initial impression to the jury that otherwise the government had intended to keep that relevant payment information from the jury.

It is somewhat difficult to understand what defense counsel is now objecting to since, at the time the objection was made, she advised the district court that she "would have no objection if the prosecution says in its opening statement after leaving this group that Mr. Marrero felt that his life was in danger and [he] turned to the FBI for protection. We would have no problem with that." Furthermore, the government attorney agreed to the defense's restrictions and suggestion that he confine his remarks to the fact that "[Marrero] felt he was threatened, and the FBI assessed the situation and put him into a program" for safety purposes. Those concessions seem generally to permit what the government said in its opening, but to which the defense now objects. Marrero was subject to cross-examination during trial and defense counsel had ample opportunity to argue that Marrero was biased due to the FBI payments. Defense counsel summed it up in his closing argument by saying that Marrero was "on the dole for $118,000 from the government, and his interpretation of the tapes is not to be truthful. We know that he would choke on the truth. . . . Marrero cares little, if anything, for the truth."

We see no abuse of discretion.

G. Trial Misconduct
1. "Terrorism"

The defense raises some additional questions about the government's trial of the case. The defendant now claims that the government's use of the word "terrorism," though infrequent, and the government's questioning of witnesses regarding their views about the possible violent overthrow of the government of the United States, was prejudicial error. We do not find that there was any objection by defense counsel at the time,/11 so our standard of review is for plain error. See United States v. Hardamon, 188 F.3d 843, 849 (7th Cir. 1999). Reversal for plain error is exercised in only the most exceptional of circumstances. United States v. Jackson, 542 F.2d 403, 409 (7th Cir. 1976) (citation omitted).

Regardless of the applicable standard of review, we see no error in the limited use by the government of the word "terrorism," which is the term generally and publically applied to charges

similar to those made against Dr. Solis. The simple definition of terrorism found in the Oxford American Dictionary 709 (1980) is the "use of violence and intimidation, especially for political purposes." That is what this is. In any event, the jury was instructed that what the lawyers might say is not evidence for the jury to consider. Further, it was defense counsel who first introduced the word "terrorist" into the trial by inquiring during voir dire if the use of the word "terror" or "terrorist" would unduly influence the jury's judgment. No prospective juror indicated it would cause any prejudice.

We see no error in the infrequent use by the government of the word "terrorism," particularly in a case dealing with the attempted bombing of a government building.

## 2.  Puerto Rican Independence

Another aspect of the objection has to do with the government's questioning of witnesses about their views as to the use of violence to protest the United States involvement in Puerto Rico. Again, because defense counsel never objected to this line of questioning,/12 this issue is reviewed for plain error. See Hardamon, 188 F.3d at 849. Dr. Solis testified about his own views on Puerto Rican independence and his support for the "political prisoners" who had advocated violence against the United States government. We therefore find nothing improper of sufficient consequence to have adversely affected the fairness of the trial.

## H.  "Special Caution" Jury Instruction

There is an additional issue raised by the defense about a jury instruction. The defense proposed an accomplice or "special caution" jury instruction/13 because the government called Edward Brooks as a witness. Brooks had been one of the original participants but, as we have mentioned, he withdrew from the FRB. He did so because he apparently had some personal objection to the degree of violence involved and because his girlfriend pressured him with some good advice which he decided to follow. Brooks testified about the FRB and others in the group up until the time he disassociated himself in the fall of 1992. The defense argues that the lack of an accomplice instruction suggests Brooks was an impartial, objective witness. The defense maintains that even though there was no evidence Brooks negotiated with the government for freedom from prosecution in exchange for testifying, the fact that he was not prosecuted cast doubt on his credibility.

This court dealt with a similar situation in United States v. Cook, 102 F.3d 249 (7th Cir. 1996). In that case, an informant had been paid for cooperating with the FBI and for wearing a wire to record conversations with the defendant. The district court declined to give a "special caution" instruction. The panel stated that a separate jury instruction is not required "as a matter of course" where there is testimony of a paid informer, and affirmed the district court's decision to not give the special instruction, holding that the use of that type of instruction is "committed to the discretion of the district court, which is best situated to detect and deal with threats of unreliable testimony, and that appellate review is deferential." Id. at 252. The court in Cook also noted that the Seventh Circuit had never reversed a criminal conviction for failure to give a special instruction for an informant's testimony, and held that "a general credibility instruction referring to the possibility of bias, which coupled with cross-examination and closing argument by counsel will put the subject before the jury for decision." Id. at 253.

In the present case there is no basis to find fault with the district court's exercise of discretion. Brooks was not paid nor given anything on the basis of his testimony. There was no government agreement not to prosecute him. He appeared at trial subject to a government subpoena. With or without the cautionary instruction, defense counsel cross-examined Brooks as to his motivations for testifying and addressed the issue in his closing argument. The district court gave the jury the standard instruction on witness credibility. We find no error in the district court's discretion in declining to give the "special caution" instruction.

I.   Jurisdiction

The last of the ten issues Dr. Solis raises on appeal is one of jurisdiction. As the issue is stated in his brief: "International Law, Binding Upon The Courts Of The United States, Deprives The Courts Of The Colonial Power To Try Citizens Of The Nation Subjected To Colonialism For Its Offenses Alleged In The Indictment." Dr. Solis maintains "[his] conviction, in defiance of international law and the Constitution of the United States, must be reversed." Basically, Dr. Solis argues that the district court lacked personal jurisdiction over him because he is a resident of Puerto Rico.

Ordinarily, one would expect a jurisdictional argument to be raised first, but defense counsel

recognized that the established law of this country was contrary to his position. See United States v. Lussier, 929 F.2d 25, 27 (7th Cir. 1991); Matta-Ballesteros v. Henman, 896 F.2d 255, 259 (7th Cir. 1990); United States v. Koliboski, 732 F.2d 1328, 1329 (7th Cir. 1984). Dr. Solis's attempt to argue that an international treaty destroys the jurisdiction of the courts of this country in itself raises a more substantial question about the defendant's standing to allege a violation of international treaties. As we have stated, "It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved." Matta-Ballesteros, 896 F.2d at 259.

Dr. Solis and his counsel nevertheless have provided the court with an extensive historical and legal analysis of the claim that the district court lacks jurisdiction. They argue that 18 U.S.C. sec. 3231 applies only to the fifty states and is unconstitutional and illegal under international law as applied to Puerto Rico. The theory which they endeavor to support is that "international law, binding upon the courts of the United States, deprives the court of the colonial power to try citizens of the nation subjected to colonialism for its offenses alleged in the indictment." The United States, it is claimed, is the colonial power and Puerto Rico has been subject to that colonialism dating back to the United States occupation of Puerto Rico in 1898. Therefore, it is argued, "the status of the United States in Puerto Rico is that of a belligerent occupant, not the sovereign." Dr. Solis further asserts that his prosecution "violates the customary norms of international law." The defense first filed a pre-trial motion in the district court to dismiss the indictment for lack of jurisdiction and later filed a motion in arrest of judgment for lack of jurisdiction. The government responded that Dr. Solis could not invoke a treaty to assert lack of jurisdiction.

Contrary to Dr. Solis's assertion that he is protected by international law, well established principles of international law make it clear that a state/14 "has jurisdiction to prescribe law with respect to . . . conduct that, wholly or in substantial part, takes place within its territory . . . ." Restatement (Third) of the Foreign Relations Law of the United States sec. 402(1)(a) (1987). In addition, a state is entitled to exercise jurisdiction to adjudicate with respect to a person if, among other things, "the person . . . had carried on activity in the state, but only in respect of such activity." Id. sec. 421(2)(i). Finally, a state has jurisdiction to "employ judicial or nonjudicial measures to . . . punish

noncompliance with its laws or regulations, provided it has jurisdiction to prescribe . . . ." Id. sec. 431(1).

Title 18 prohibits attacks on federal facilities located on our own territory. These laws fall well within the boundaries of sec. 402, and are in no way unreasonable under the limitations placed on jurisdiction to prescribe of sec. 403 (listing relevant factors of when jurisdiction over a person or activity is unreasonable). There is jurisdiction to adjudicate, or personal jurisdiction, over Dr. Solis because he undertook the activities involved while residing in this country. Finally, as stated in the Restatement of Foreign Relations, because the United States has jurisdiction to prescribe, there is clearly jurisdiction to enforce the laws of the country through judicial proceedings.

Dr. Solis, regardless of his political motivation, was not selectively singled out for prosecution because of his political views. He may, however, now view himself as another of this country's "political prisoners," as he calls them, but there was no politics involved so far as the government is concerned, only criminal acts contrary to federal laws which are applicable to all. Dr. Solis even invokes the Boston Tea Party./15 The political future of Puerto Rico, whatever it may be, is not the issue before this court.

III.  CONCLUSION

Defense counsel have raised every conceivable argument in behalf of their client. Much of the defense case rests on credibility, attacking the credibility of prosecution witnesses and defending the credibility of defense witnesses. In closing argument to the jury, defense counsel said, "I am given great comfort by the thin line of protection that stands between a lie and an innocent man, and that thin line of protection is you, a jury, a jury sworn to impose on the government a burden of proof beyond a reasonable doubt." Now, however, the defense finds fault with the jury's adverse determination. We find no basis to overturn the jury's verdict. Defense counsel also raised other details in connection with the issues discussed, but they are not specifically mentioned here as we viewed them as irrelevant or without merit.

AFFIRMED.

/1 According to Marrero, the translation is "Puerto Rican Revolutionary Front."

/2 Again, according to Marrero, the translation is "Puerto Rican National Liberation Movement."

/3 Marrero testified that Dr. Solis told the group that Citibank had benefitted from its tax-exempt status in Puerto Rico and had taken advantage of the Puerto Rican people and was part of the colonial problem in Puerto Rico.

/4 Defined by Marrero as "a press statement, a declaration."

/5 Dr. Solis was not abducted in Puerto Rico and brought to the United States for trial of a crime committed in Puerto Rico. See United States v. Alvarez-Machain, 504 U.S. 655 (1992).

/6 According to testimony from Martha Gonzalez at trial, an independentista would be an ardent supporter of Puerto Rican independence; one of the prominent independentistas was a woman who was in jail for a seditious conspiracy to overthrow the United States government.

/7 Fed. R. Crim. P. 21(b) provides for transfer of venue "for the convenience of parties and witnesses, and in the interest of justice . . . ."

/8 One of the prospective jurors who was stricken for cause turned out to be the aunt of two of the Puerto Rican political prisoners and the aunt of Marrero's ex-wife.

/9 Seventh Circuit Federal Criminal Jury Instructions (West 1999), sec. 3.17 reads as follows:

  You have heard recorded conversations. These recorded conversations are proper evidence and you may consider them, just as any other evidence.

  When the recordings were played during the trial, you were furnished transcripts of the recorded conversations.

  The recordings are the evidence, and the transcripts were provided to you only as a guide to help you follow as you listen to the recordings. The transcripts are not evidence of what was actually said or who said it. It is up to you to decide whether the transcripts correctly reflect what was said and who said it. If you noticed any difference between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. And if after careful listening, you could not hear or understand certain parts of

the recordings, you must ignore the transcripts as far as those parts are concerned.

/10 Seventh Circuit Federal Criminal Jury Instructions, sec. 3.18 reads as follows:

Among the exhibits admitted during the trial were recordings that contained conversations in the _____ language. You were also provided with English transcripts of those conversations. The transcripts were provided to you [by the government] so that you could consider the content of the conversations on the recordings.

Whether a transcript is an accurate translation, in whole or in part, is for you to decide. In considering whether a transcript accurately describes the meaning of a conversation, you should consider the testimony presented to you regarding how, and by whom, the transcript was made. You may consider the knowledge, training, and experience of the translator, as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case. You should not rely in any way on any knowledge you may have of the language spoken on the recording; your consideration of the transcripts should be based on the evidence introduced in the trial.

/11 In its Memorandum and Order responding to Dr. Solis's Motion in Arrest of Judgment and Motion for a New Trial, the district court noted, "Solis-Jordan never objected--before, during or after the government's closing--to the terrorist comments. . . . Defense counsel certainly could [also] have objected [at sidebar], but did not, and therefore, waived the objection."

/12 The defense did object during the government's cross-examination of a defense witness when the government was asking the witness if he had been the guest of honor at an MLN People's Parade, which was reported in an MLN newspaper. The defense objected to "commie-baiting in the courtroom," arguing the government was presenting the annual Puerto Rican Day Parade as an MLN-sponsored event. The court terminated that line of questioning at that point.

/13 Seventh Circuit Federal Criminal Jury Instructions, sec. 3.13(e) reads as follows:

You have heard testimony from _____ who: has pleaded guilty to an offense arising out of the same occurrence for which the defendant is now on trial. His/her guilty plea is not to be considered as evidence against the defendant.

You may give his/her testimony such weight as

you feel it deserves, keeping in mind that it
must be considered with caution and great care.

/14 The Restatement of Foreign Relations, sec. 201
defines a "state" as follows:

Under international law, a state is an entity
that has a defined territory and a permanent
population, under the control of its own
government, and that engages in, or has the
capacity to engage in, formal relations with
other such entities.

/15 Disguised as Indians, a group of citizens in 1773
forced their way on to some British ships docked
in Boston Harbor. The ships carried a cargo of
tea transported from England for sale in the
Colonies. The tea was dumped overboard into the
harbor and the "Indians" departed. However, no
attempt was made to blow up the ship.