In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-1579

WILL TINNER,

*Plaintiff-Appellant*,

*v.*

UNITED INSURANCE COMPANY OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 98 C 12—**Richard L. Young**, *Judge.*

ARGUED SEPTEMBER 18, 2002—DECIDED OCTOBER 10, 2002

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff Will Tinner ("Tinner")
brought an action under Title VII of the Civil Rights Act
of 1964, as amended by the Civil Rights Act of 1991, 42
U.S.C. § 2000e *et seq.*, against his employer, United Insur-
ance Company of America ("United"), for race discrimina-
tion, a racially hostile working environment, retaliation,
wrongful termination, and state and federal counts of con-
structive discharge. The district court dismissed several
of Tinner's claims on summary judgment and a trial pro-
ceeded on Tinner's claim for unlawful termination. A jury
returned a verdict in favor of United and judgment was
entered on the verdict. Tinner first appeals the district

court's denial of his *Batson* challenge, which arose out of United's peremptory strike of the only African-American member of the venire panel. Tinner also appeals the district court's grant of partial summary judgment on several of his discrimination claims because they were time-barred and not subject to a continuing violation theory. We affirm on both counts.

## BACKGROUND

### A.  Tinner's Employment History with United

United employed Tinner as a Sales Representative at its Evansville, Indiana office from March 19, 1990, through June 10, 1996. United is a home service insurance company whose coverage is generally provided to low-income families. As a Sales Representative, Tinner went door-to-door to service his customers and solicit new business within his assigned geographical area, known as a "debit route." Tinner's compensation came primarily from commissions, and his income fluctuated from month to month based on his level of sales and/or charge backs to his commission as a result of unpaid premiums. During his six years of employment with United, Tinner developed a very successful book of business and twice received the salesman of the year award.

According to Tinner, shortly after beginning his employment, United transferred his debit route from a middle class area of Evansville to the predominately African-American area of the city. Tinner, who is African-American, was told by his superiors that they believed he would be more successful in this area. Tinner, by his own admission, excelled in his new debit route and "did better than anyone else ever has or probably ever will." Tinner believed, however, that United's decision to transfer his debit route in 1990 was discriminatory.

Three years later, in the spring of 1993, an incident occurred between Tinner and Jane Merchant ("Merchant"), a white, female office administrator for United. Apparently, Tinner asked Merchant to complete some paperwork for him, but Merchant took offense at the way in which Tinner carried himself when making the request. Merchant complained to management and Tinner voluntarily apologized to her. The District Manager also admonished Tinner to be careful with the way he treated Merchant in the future. Tinner believed that United discriminated against him in this instance.

In the winter of 1994, following a heavy snowstorm in Evansville, Tinner arrived at work wearing blue jeans, sneakers, and a shirt. United's dress code at the time required Sales Representatives to wear a tie and dress slacks. Tinner's manager told him to return home and change his clothing before attending a sales meeting in the office later that day. The following day, the District Manager presented Tinner with a written warning that Tinner refused to sign. The Regional Manager for United subsequently told Tinner that he would not have to sign the warning. Tinner claims that other employees frequently wore such attire but that management singled him out in discriminatory fashion.

Nothing further occurred until May 1996 when Tinner's District Manager, Angie Petts ("Petts"), asked him to apply for a new Staff Manager position in the Evansville office. After interviewing with the Regional Vice-President, Tinner received a job offer at a salary ten dollars per week higher than his then-average weekly salary. The offer was also fifty dollars per week higher than the then-standard Staff Manager salary. The Regional Vice-President offered Tinner the higher salary because he felt that Tinner's past experience and performance justified the increase. Tinner, however, believed that the offer had the potential to reduce his income by over $400 per month

because it was less than his actual salary at that time. Accordingly, he rejected the promotion offer and remained a Sales Representative.[1] Tinner believed that United's actions were also discriminatory at the time.

Finally, shortly after rejecting the promotion offer, Tinner requested vacation time from June 10, 1996, through June 14, 1996. Petts denied his request because he had taken a week off in mid-April and because he was not meeting the expected sales increase for his debit route. On June 3, 1996, Tinner called in sick with back pain, for which he sought some form of medical treatment.[2] Petts unsuccessfully attempted to reach Tinner at home on the following two days. United introduced evidence at trial establishing that Tinner sought other employment during this time. In fact, on May 30, 1996, Tinner filled out a job application with American General Financial Group. On June 6, Petts spoke with Tinner and informed him that

---

[1] Neither party adequately explained exactly how Tinner's compensation as a Staff Manager would have been calculated, nor did they explain how his compensation could decrease at a management level position. Tinner argues that because his compensation would have been lower as a Staff Manager, despite the fact that United offered him a higher starting salary than normal, United again treated him in discriminatory fashion.

Subsequent to Tinner's rejection of the offer, United offered the job to Dave Brown, a younger, white male who had been with the company fewer years than Tinner. Brown accepted the job at United's standard salary.

[2] In his brief, Tinner argues that witnesses corroborate that he followed company policy by informing Robin Cochran, an office administrator, of his medical absence when he could not reach Petts or any other supervisor over the phone on the morning of June 3. United, however, claims that Tinner failed to follow company policy by not directly informing a district or staff manager.

he was to report to work on June 10 or present a doctor's note as to why he could not work. Petts also sent a letter to Tinner's home reiterating the conversation of June 6.

On June 10, 1996, Tinner arrived at United's office and gave an office administrator a letter addressed to Petts containing his two-week resignation notice effective June 21, 1996, as well as a note signed by his doctor stating that he could return to work on June 10. Tinner, however, did not work that day for United, though he did sign an employment contract with American General on June 10, 1996. On June 11, 1996, Tinner received notice that United terminated his employment as of June 10, 1996, because of his failure to return to work that day.

### B.  Tinner's Claims and the Procedural History

Following his termination, Tinner filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC) on September 3, 1996. The EEOC issued Tinner a right-to-sue letter, and he timely filed the instant case on January 20, 1998. Tinner raised claims for race discrimination, a racially hostile working environment, retaliation, wrongful termination, and state and federal counts of constructive discharge.

United filed a motion for summary judgment arguing that the debit route transfer in 1990, the incident with Merchant in 1993, and the dress code violation in 1994 were time-barred because Tinner had failed to file a charge with the EEOC within 300 days of those events. They also argued that the 1996 termination was devoid of discriminatory intent.

Tinner responded that the actions, when taken as a whole under a continuing violation theory, demonstrated a hostile work environment and racial harassment. The district court granted partial summary judgment in favor

of United on the three alleged discriminatory acts in 1990, 1993, and 1994 because they were time-barred. It further granted summary judgment to United on Tinner's claims that the promotion offer at lower pay and the denial of vacation in May 1996 were discriminatory. Finally, the court granted summary judgment for United on Tinner's federal constructive discharge, hostile working environment, and retaliation claims.

The court's order left Tinner with only his state constructive discharge claim, for which the court instructed him to file a more definite statement. Tinner complied with that order in December 1999. In March 2000, however, Tinner filed a motion asking the court to reconsider the previous ruling regarding his unlawful termination, claiming new evidence created a genuine issue of material fact as to Petts' racial animus towards Tinner. Specifically, Tinner pointed to affidavit testimony by Clarence James ("James"), a United employee, about a conversation James overheard prior to Tinner's termination in which Petts referred to Tinner as a "nigger" and said that Tinner should "watch his back." The court reinstated the claim.

The case proceeded to trial in January 2001 on Tinner's claim of wrongful termination, which he said occurred prior to the effective date of his resignation. On January 31, 2001, the jury returned a verdict in United's favor and judgment was entered on the verdict.

### C.  Jury Selection at Trial

Tinner's appeal centers first around the selection of the jury and United's use of a peremptory challenge to eliminate the only African-American member of the venire panel. During *voir dire* of the panel, counsel for United asked each potential juror the following questions: "Do any of you know anyone who's filed a suit alleging discrim-

ination of any kind? If you do, any of you know—anybody know of or heard of anybody who's filed a suit alleging discrimination?" In response to these questions, two potential jurors answered affirmatively.

The first was Mr. Kuester, a white male, whose company had charges of racial discrimination filed against it. Upon questioning from Tinner's counsel, Mr. Kuester stated that the claims against his company would not prevent him from listening fairly to Tinner's case. Mr. Kuester also stated that he was aware discrimination occurs, that sometimes he felt it was alleged when not true, but that when it does occur it is not right.[3] Tinner's counsel, nevertheless, exercised a peremptory challenge to exclude Mr. Kuester from the jury. United did not object to Mr. Kuester's exclusion.

The second venire member who responded affirmatively to counsel for United's questions was Mrs. Clardy, an African-American female whose sister filed a discrimination claim against her employer. Mrs. Clardy stated that

---

[3] In response to *voir dire* from Tinner's counsel, Mr. Kuester said:

> I think I could be fair. You should probably know that my corporation has—I have not been personally involved in any lawsuits, but we have been accused of racial discrimination, and it was never—it was never—one case, there was a complaint filed with the EEOC, and they came back with a ruling there was no indication of discrimination.

When asked by Tinner's counsel whether those charges would prohibit him from listening fairly to Tinner's case, Mr. Kuester replied, "I don't think so." He went on to state, with respect to race discrimination:

> I know it goes on. There are—I think there are cases where discrimination is claimed where there possibly was none, but there's certainly racial discrimination that's ongoing in our country. It's not right.

she did not know whether her sister's experience would affect her (Mrs. Clardy's) determination in Tinner's case because she did not know all of the facts of her sister's "ordeal."[4] In response to questions from the court, Mrs. Clardy felt she could be "honest and open-minded" and that she could be objective even if the evidence included testimony that racial slurs were directed at Tinner. United's counsel, however, exercised a peremptory challenge and struck Mrs. Clardy from the jury panel.

Counsel for Tinner then invoked a *Batson* challenge and requested that United give a race-neutral reason for striking Mrs. Clardy, the only African-American member of the venire. Counsel for United responded that he struck Mrs. Clardy because her sister previously filed a discrimination claim against her employer and because Mrs. Clardy described her sister's experience as an "ordeal." The court accepted United's response as race-neutral, finding that Mrs. Clardy might have a difficult time remaining objective. The resulting jury contained no minority members.

## ANALYSIS

### A. United's Peremptory Challenge of Mrs. Clardy

This Court employs a clearly erroneous standard when reviewing the district court's factual findings under a *Batson* challenge. *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 940 (7th Cir. 2001) (extending same standard to peremptory challenges on the basis of gender);

---

[4] Mrs. Clardy stated:

> It's hard to say because I didn't go through the courts with her. Basically, I know what happened or what she told me was her ordeal, but as far as the company she was working with, you know, I don't know.

*United States v. Jordan*, 223 F.3d 676, 686 (7th Cir. 2000) (applying clearly erroneous standard to race challenge). The determination to accept a race-neutral reason often turns on the credibility of the attorney exercising the peremptory challenge. The trial judge is clearly in the best position to make that factual determination. Accordingly, "there is no basis for reversal on appeal unless the reason given is completely outlandish or there is other evidence which demonstrates its falsity." *United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998), *modified by*, 136 F.3d 1115 (7th Cir. 1998).

Under the test established by the Supreme Court in *Batson v. Kentucky*, the Equal Protection Clause prohibits the use of a peremptory challenge to strike a potential juror from the venire panel solely because of the person's race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *see also Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Jordan*, 223 F.3d at 686. The Court subsequently extended the same rule to civil proceedings. *Alverio*, 253 F.3d at 939 (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991)). Under *Batson*, three well-defined steps determine the validity of a challenged peremptory strike: 1) the party objecting to the peremptory strike must first make a prima facie showing that the strike was made on the basis of race; 2) the burden then shifts to the party exercising the peremptory challenge to offer a race-neutral reason for the strike; and finally 3) the trial court must decide whether the proffered reason is pretextual and whether the party opposing the strike has proven purposeful discrimination. *Hernandez*, 500 U.S. at 358-59; *Jordan*, 223 F.3d at 686.

The parties here do not contest that Tinner made a prima facie showing when United's counsel exercised a peremptory challenge to strike Mrs. Clardy. United then offered two reasons for striking Mrs. Clardy, specifically that her sister filed a discrimination claim against her employer and that Mrs. Clardy described her sister's situation as an "ordeal."

Tinner contends that United's questions were surrogates for race, thereby establishing purposeful discrimination. Although United asked every member of the venire panel whether they knew or heard of anyone who filed a discrimination claim, Tinner argues that when posed to the only African-American venire member the questioning amounted to asking her "Are you black?" or "Were any of your ancestors slaves?" The district judge, however, accepted United's reasons as race-neutral and found that Tinner failed to prove purposeful discrimination. Thus, the only issues on appeal are whether the trial judge committed clear error in finding: 1) that United's proffered reasons for striking Mrs. Clardy were race-neutral; and 2) that Tinner ultimately failed to demonstrate purposeful discrimination.

### 1. Whether United's reasons were race-neutral

We deal first with whether United's proffered reasons were race-neutral. At issue is the facial validity of the reasons offered. "A neutral explanation . . . means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the [party's] explanation, the reason offered will be deemed race-neutral." *Hernandez*, 500 U.S. at 360. The persuasiveness of United's reasons is not relevant at this stage of the inquiry. *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam); *see also United States v. Evans*, 192 F.3d 698, 701 (7th Cir. 1999) (stating that "[u]nlike a challenge for cause, a peremptory strike need not be persuasive or even plausible so long as it is race-neutral"). Clearly, the party wishing to use a peremptory strike need not defend the strike as though it were a challenge for cause. *Morse v. Hanks*, 172 F.3d 983, 985 (7th Cir. 1999). What matters, simply, is whether United offered a reason or reasons for excluding Mrs. Clardy that are not facially related to her

race. If United did, then the district court did not commit clear error in accepting those reasons as race-neutral.

United's first reason for striking Mrs. Clardy related to her sister's filing of a discrimination lawsuit. On its face, this reason has nothing to do with Mrs. Clardy's race. In addition, this Court previously upheld as race-neutral reasons relating to a venire member's involvement in or relationship to litigation or potential litigation. *See Alverio*, 253 F.3d at 940 (holding that exclusion of juror was not racially motivated because, in part, "she was the only prospective juror who had been a plaintiff in a lawsuit"); *see also United States v. Briscoe*, 896 F.2d 1476, 1488-89 (7th Cir. 1990) (upholding peremptory challenges of two jurors involved in criminal prosecutions and challenge of juror who had been a victim of crime and was bitter that no one was ever charged for the crime). While Mrs. Clardy was neither the plaintiff nor the victim of discrimination in her sister's lawsuit, her relationship to and knowledge of the facts and circumstances of the case cannot be discounted. Mrs. Clardy stated in *voir dire* that she "did not go through the courts" with her sister. Being present throughout the litigation, however, would not be necessary to taint her view of discrimination litigation.

This line of reasoning is further supported by United's second reason for striking Mrs. Clardy, because she categorized her sister's experience as an "ordeal." Again, United's second reason is facially neutral. The term "ordeal" clearly carries a negative connotation[5] and suggests that Mrs. Clardy, quite naturally, felt sympathetic towards her sister's situation. No one would fault Mrs. Clardy for expressing such sympathy towards a family member, but it

---

[5] An ordeal is "a difficult or painful experience, esp. one that severely tests character or endurance." THE AMERICAN HERITAGE DICTIONARY 874 (2d coll. ed. 1991).

is precisely such sympathy that United sought to exclude from the jury. There is nothing facially invalid in United's desire to exclude someone whose close relative went through the "ordeal" of a discrimination lawsuit. The district court did not commit clear error in finding that United's proffered reasons were race-neutral.

### 2. *Whether Tinner demonstrated purposeful discrimination*

Because United offered two race-neutral reasons for exercising its peremptory challenge of Mrs. Clardy, the final step of the *Batson* test required the trial court to determine whether Tinner met his burden of showing purposeful discrimination. *Batson*, 476 U.S. at 89. Again, the trial court's determination on this issue is a factual one and can only be reversed by this Court on a finding of clear error. *Evans*, 192 F.3d at 700. To prevail at this stage of the inquiry, Tinner must demonstrate that, despite United's race-neutral justification for its peremptory challenge, United's actions showed discriminatory purpose.

Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Hernandez*, 500 U.S. at 360. To be sure, disparate impact upon a particular group is not sufficient to establish discriminatory intent on United's part. *Id.* (stating that "[a] court addressing this issue must keep in mind the fundamental principle that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause'"). At this stage, the district court can consider the persuasiveness of United's reasons for striking

Mrs. Clardy, and "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

In *Alverio v. Sam's Warehouse Club, Inc.*, this Court upheld the peremptory strikes of all three women on the venire panel, in part, because defense counsel felt the women lacked business experience and knowledge. *Alverio*, 253 F.3d at 940. The *Alverio* Court specifically doubted that "having business experience" amounted to a proxy for "male juror" because women today cannot be said to have less work experience than their male counterparts. *Id.* In *United States v. Stafford*, this Court also upheld a peremptory challenge of an African-American female because the prosecution believed that her strong religious background and involvement would make it difficult for her "'to sit in judgment on a fellow human being.'" *Stafford*, 136 F.3d at 1113-14. In providing its race-neutral explanation for the strike, the prosecution responded, in part, by stating that the potential juror "'watches gospel programs as well.'" *Id.* The defendant argued that "as well" amounted to finishing the thought with "as being black." *Id.* at 1114. This Court, however, rejected the argument as "conjecture" and found no basis to overturn the trial judge's ruling. *Id.*

In the case at bar, Tinner argues that asking Mrs. Clardy whether she knew of anyone who filed a discrimination claim amounted to asking her whether she was black or whether her ancestors were slaves. Tinner's argument is misplaced for several reasons. First, United asked the same question to every member of the venire. It did not single out Mrs. Clardy as the only potential juror for this line of questioning. It is far-fetched to assert that United challenged Mrs. Clardy because of her race when all potential jurors were questioned on the same grounds.

Second, United never asked any potential juror about race discrimination claims specifically. Instead, United con-

cerned itself with anyone who had any connection to any type of discrimination claim—age, gender, race, disability, national origin, or religion. Tinner, however, argues that asking an African-American member of the panel such a question is more likely to result in an affirmative answer. While members of a racial minority group may be more likely to face race discrimination at some point, and therefore, might be more likely to respond affirmatively to such questioning, we cannot determine that a disparate impact on African-American venire members amounts to purposeful discrimination by United. *See Hernandez*, 500 U.S. at 359-60.

Similar to the comparisons in *Alverio* and *Stafford*, asking an African-American venire member whether they have any connection to someone who filed a discrimination lawsuit cannot today be a proxy for asking whether they are black in an effort to exclude the person from the jury on the basis of race. Many people of every age, gender, race, disability, national origin, or religion might answer affirmatively when asked if they have any connection to any type of discrimination. The fact that Mrs. Clardy's sister filed a discrimination claim amounts to coincidence, not purposeful discrimination.[6]

---

[6] Tinner's argument is interesting in that he relied on United's questioning to exercise a peremptory strike of his own. Tinner challenged Mr. Kuester, whose company had discrimination charges filed against it in the past. Presumably, Tinner excluded Mr. Kuester because he fell on the side of "management," and Tinner's counsel wanted to ensure a more plaintiff-friendly jury panel. United did not object to the strike of Mr. Kuester, who was white. This type of challenge in jury selection is crucial to the functioning of our adversarial legal system. Just as Tinner's challenge of Mr. Kuester is not indicative of a purposeful effort to exclude whites, United's challenge of Mrs. Clardy

(continued...)

Accordingly, we hold that the district court correctly found that Tinner failed to establish purposeful discrimination on the part of United in its use of a peremptory challenge to strike Mrs. Clardy. United offered a facially race-neutral explanation for its challenge, and the trial judge did not commit clear error in finding that United's actions were not pretextual. The decision of the district court is affirmed.

### *3. Tinner urges for a different standard of review*

Tinner also argues that this Court should adopt an alternative standard of review for *Batson* challenges. Namely, he argues that we should exercise our supervisory authority within this Circuit and employ a *de novo* review of *Batson* challenges on appeal or establish a trial burden of clear and convincing proof. Neither argument persuades us to alter what has long been established law in this Circuit.

This Court held that a prima facie *Batson* case can be established when a party uses a peremptory challenge to strike the only African-American member of the venire panel. *Morse*, 172 F.3d at 985. The Supreme Court noted that at step two of the *Batson* inquiry, unless the proffered reason is facially discriminatory, it will be accepted as race-neutral. *Purkett*, 514 U.S. at 768. Thus, the persuasiveness of the reason is relevant only at the third step and it is at this point that the trial court determines if the reason is pretextual. *Id*. The law in this Circuit clearly establishes that this final determination is a factual one left to the trial judge and reversible only upon a

(...continued)
is not indicative of its efforts to systematically exclude African-Americans.

finding of clear error. *Alverio*, 253 F.3d at 940. We decline to establish a trial burden of clear and convincing proof upon a party defending against a *Batson* inquiry. We continue to hold that the clear error test shall govern the review of factual determinations made by the trial court under *Batson*. The district court held that United's proffered reasons were race-neutral and the findings were not clearly erroneous.

### B.  *Tinner's Continuing Violation Claim*

This Court reviews the grant of summary judgment *de novo* and draws all reasonable inferences in favor of the nonmoving party. *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395 (7th Cir. 1999). Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, requires that a charge of discrimination be filed with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1) (2002). The statute, however, extends the time period for the filing of the charge to 300 days when the aggrieved person initially institutes proceedings with a state or local agency that has the power to grant relief in the situation.[7] *Id.*

Following the Supreme Court's recognition of the continuing violation theory in *United Air Lines, Inc. v. Evans*, 431

---

[7]  We note, at this point, that the record does not indicate whether Tinner filed a charge with any Indiana state or local agency before filing his EEOC charge on September 3, 1996. The parties assume in their briefs that 300 days is the proper time period, though 180 days may well be the correct time frame if Tinner's only action was to file a charge with the EEOC. Ultimately, Tinner's continuing violation claim fails under either time period.

U.S. 553 (1977), this Court discussed the three theories under which a plaintiff may establish a continuing violation. *Stewart v. CPC Int'l, Inc.*, 679 F.2d 117, 120-21 (7th Cir. 1982). The first situation occurs when an employer makes employment decisions over time that make it difficult for the employee to determine the actual date of discrimination. *Jones v. Merch's Nat'l Bank & Trust Co. of Indianapolis*, 42 F.3d 1054, 1058 (7th Cir. 1994). This theory is inapplicable in Tinner's case because he points to specific dates and instances where he felt discriminated against—the 1990 debit route transfer, the 1993 Jane Merchant incident, and the 1994 dress code violation. The second theory under which a continuing violation can survive involves an express discriminatory policy of the employer. *Stewart*, 679 F.2d at 121. Likewise, this theory is inapplicable in the case at bar because Tinner does not argue that United relied on an express discriminatory policy in its actions.

So, Tinner's claim must fall under the third theory of a continuing violation, where discrete acts of discrimination are part of an ongoing pattern and at least one of the discrete acts occurred within the relevant limitations period. *Filipovic*, 176 F.3d at 396; *Young v. Will County Dept. of Pub. Aid*, 882 F.2d 290, 292 (7th Cir. 1989). Under this theory, the only issue before this Court is whether Tinner created a genuine issue of material fact regarding the reasonableness of his not filing a charge with the EEOC until September 3, 1996, given the discrimination he felt as a result of the 1990, 1993, and 1994 incidents, which he now argues are part of a continuing violation. *Filipovic*, 176 F.3d at 396 (stating that "[t]he continuing violation doctrine is applicable only if 'it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct'"); *Selan v. Kiley*, 969 F.2d 560, 565-66 (7th Cir. 1992) (asking rhetorically "[w]hat justifies treating a series of separate violations as a con-

tinuing violation? Only that it would have been unreasonable to require the plaintiff to sue separately on each one").

Unfortunately for Tinner, the Supreme Court recently settled this question. In *National Railroad Passenger Corp. v. Morgan*, the Court held that a discrete discriminatory act occurs on the day it happens. *Nat'l R.R. Passenger Corp. v. Morgan*, 122 S.Ct. 2061, 2070 (2002). According to the Court,

> discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.

*Id.* at 2072 (emphasis added). While the plaintiff in *Morgan* argued that he suffered from several discriminatory acts while employed by the defendant, the Court held that only those acts that fell within the 300-day period were actionable. *Id.* at 2073. The *Morgan* Court noted that courts may choose to apply equitable doctrines such as tolling or estoppel, "although they are to be applied sparingly." *Id.* at 2072. In the case at bar, Tinner does not urge this Court to adopt either of those equitable doctrines. Therefore, we will not consider the application of such remedies to this case.

Even were we to consider such doctrines, it is unlikely that Tinner would prevail. This Court previously stated that,

> [t]he concept of *cumulation* suggests a critical limiting principle. Acts . . . so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations.

*Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996) (emphasis in original), *abrogated on other grounds by*, *Nat'l R.R. Passenger Corp. v. Morgan*, 122 S.Ct. 2061 (2002). In other words, a plaintiff who feels discriminated against by a discrete act, but fails to timely file charges on that act, cannot later reach back to those events when the statute of limitations expires in order to form a continuing violation claim. So, if the employee knew, or with the exercise of reasonable diligence should have known, that each act, once completed, was discriminatory, the employee must sue upon that act within the relevant statutory period. *Jones*, 42 F.3d at 1058; *see also Morgan*, 122 S.Ct. at 2072.

We now consider three additional factors to determine whether a continuing violation claim is actionable: 1) whether the acts involve the same subject matter; 2) the frequency with which the acts occur; and 3) the degree of permanence of the alleged acts of discrimination that should trigger an employee's awareness and duty to assert his rights. *Filipovic*, 176 F.3d at 396. In *Filipovic v. K & R Express Systems, Inc.*, we held that the name-calling and ethnic slurs to which co-workers subjected the plaintiff on a daily basis over a thirteen-year period prior to the filing of charges could not sustain a continuing violation claim. *Filipovic*, 176 F.3d at 396. Furthermore, there was an eight-year gap in the alleged discriminatory conduct, such that the incidents could not be linked together into a single chain. *Id.* at 397.

Similarly, in *Selan v. Kiley*, this Court held that a two-year gap between allegedly discriminatory acts could not support a continuing violation claim. *Selan*, 969 F.2d at 567. While the acts at question in *Selan* involved the same type of discrimination (racial), they were not frequent enough because of the two-year gap between them. *Id.* Furthermore, the acts once taken were sufficiently perma-

nent, in that they separately and permanently removed managerial duties from the plaintiff. *Id.* Because of their permanent nature, each discrete act should have triggered the plaintiff's awareness of the need to assert or else waive her rights. *Id.*

In the case at bar, Tinner argues that the 1990 debit route transfer, the 1993 Jane Merchant incident, and the 1994 dress code violation all form a continuing violation on United's part that is ultimately related to his alleged wrongful discharge on June 10, 1996. Tinner, however, did not file his discrimination charge with the EEOC until September 3, 1996. While he timely filed his wrongful termination charge, he clearly did not file that charge with the EEOC within either 180 or 300 days of the three incidents in 1990, 1993, and 1994. Tinner cannot now "piggy-back" those earlier events to his timely filed wrongful termination claim to form a continuing violation.

Applying the *Filipovic* factors to the 1990, 1993, and 1994 incidents further demonstrates that each one represented a discrete act that became actionable according to *Morgan* when they occurred. First, Tinner admits that he felt discriminated against on the basis of his race and that he complained after each incident. Second, as in *Selan* and *Filipovic*, these incidents were not frequent enough because there was a six-year, three-year and two-year gap, respectively, between each discrete act and Tinner's termination in 1996. Finally, the degree of permanence surrounding his debit route transfer in 1990 certainly should have made Tinner aware of the need to protect his rights. While the Merchant incident in 1993 and the dress code violation in 1994 appear more sporadic than permanent in nature, Tinner chose not to file charges after either of these events even though he felt discriminated against at the time. Tinner argues that not filing charges after these incidents is a testament to his charac-

ter to deal with the discrimination and still maintain his productivity as a Sales Representative. Despite this belief, Tinner's failure to file charges sooner kills his late-filed claims.

In short, United's actions cannot be said to form a single chain that supports Tinner's continuing violation claim for racial discrimination. Tinner was not reasonable in waiting until 1996 to file his charge alleging racial discrimination for acts that occurred in 1990, 1993, and 1994, and any claims for those earlier acts were time-barred. For that reason, no genuine issue of material fact existed to preclude summary judgment in favor of United, and the decision of the district court is affirmed.

## CONCLUSION

The district court correctly held that United offered facially race-neutral reasons for using a peremptory challenge with Mrs. Clardy, specifically that her sister previously filed a discrimination claim and that Mrs. Clardy described her sister's situation as an "ordeal." The district court also did not commit clear error in holding that Tinner failed to show purposeful discrimination in United's challenge of Mrs. Clardy. Thus, Tinner's *Batson* challenge cannot succeed. Likewise, Tinner failed to show any genuine issue of material fact sufficient to survive summary judgment on his continuing violation claim because the three earlier acts he complained of did not constitute a single chain of discrimination and were therefore time-barred. Accordingly, the judgment of the district court on both counts is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*