In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-4224

KERRIE MILLIGAN-GRIMSTAD,

*Plaintiff-Appellant,*

*v.*

MORGAN STANLEY and MORGAN
STANLEY SMITH BARNEY LLC,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 8913 — **Thomas M. Durkin**, *Judge.*

———————————

ARGUED SEPTEMBER 12, 2017 — DECIDED DECEMBER 11, 2017

———————————

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Kerrie Milligan[1] alleges that Morgan
Stanley Smith Barney ("Morgan Stanley") fired her on the ba-
sis of her sex and that it allowed her coworkers to create a
hostile work environment. Title VII of the 1964 Civil Rights

---

[1] Plaintiff now goes by Milligan rather than Milligan-Grimstad.

Act prohibits both. The district court granted summary judgment in Morgan Stanley's favor, finding that Morgan Stanley dismissed Milligan for her performance and that the conduct she alleged did not create a hostile work environment. Milligan now appeals. We affirm.

## I. Background

This appeal challenges the district court's grant of summary judgment in favor of Morgan Stanley. Thus, the following facts are either undisputed or disputed but taken in the light most favorable to Milligan. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986).

*A. Milligan's allegations*

Milligan joined Morgan Stanley as a sales associate in 2001. In 2005, after a series of promotions, she partnered with a senior financial advisor, John Mitchell, on a number of client accounts. This partnership continued until Morgan Stanley fired Milligan in 2012.

During her deposition, Milligan testified that she was mistreated throughout her career at Morgan Stanley. Broadly, her allegations describe two periods of abuse. The first period extended from about 2003 to 2009, though Milligan's testimony on the duration was unspecific and conflicting. Milligan alleges that coworkers, including a financial advisor named David Brendza, harassed, unduly criticized, and made sexual advances towards her during this period. Milligan never reported this alleged harassment to management.

A second period began in 2011—when Mitchell started to regularly comment to Milligan about the revealing outfits of a CNBC anchor—and continued until Morgan Stanley fired

Milligan the following year. During this second period, Milligan married. Though Milligan never revealed if she had pregnancy plans, Mitchell frequently questioned her on the topic. Ultimately, he asked that Milligan plan her pregnancy to accommodate his work schedule.

Also during this second period, Mitchell began to plan for retirement and spent more time out of the office. Management encouraged him and Milligan to bring in other advisors to help them service their book of business. After Mitchell and Milligan rejected a number of potential partners, management encouraged them to work with Brendza on their accounts. Milligan, however, had no interest in partnering with him. Nevertheless, Milligan and Mitchell discussed Brendza at various points in 2011 and 2012. Milligan's immediate supervisor, Troy Mooyoung, and the manager of the Chicago branch, Mark Evans, occasionally joined these conversations. And, on September 19, 2012, Brendza joined Milligan and Mitchell in a client meeting in which he told the client that Milligan planned to start a family. Milligan never reported harassment from this second period either.

B. *The fraudulent wire transfer and later investigation*

Earlier in 2012, Milligan processed a fraudulent wire transfer request that led to an investigation. That summer, Milligan received a series of emails—signed by a longtime client and her husband—requesting that Milligan transfer $36,900 to an account she wasn't familiar with. After a person who Milligan recognized as the client's husband called to confirm the transaction, Milligan transferred the funds.

On August 10, the client contacted Milligan to inform her that she had been the victim of identity theft and had not authorized the transaction. Over the next few weeks, Evans investigated the way that Milligan handled the request. He spoke with Milligan, Mooyoung, fraud prevention and compliance officers, and in-house counsel. He also studied emails and notes related to the transfer. Finally, he reviewed Milligan's past disciplinary violations: a suspension for signing a client's name to a letter of authorization and a letter of education for adding information to a form that had already been signed by a client.

*C. Milligan's dismissal and the lawsuit*

On September 24—over a month after Evans began his investigation into Milligan's handling of the fraudulent wire request and five days after Brendza had joined the client meeting—Evans fired Milligan.

Milligan sued, alleging that she had been terminated on the basis of her sex and that her coworkers' mistreatment of her over the course of her career had created a hostile work environment. Morgan Stanley responded that her dismissal resulted from her disciplinary record and how she handled the fraudulent transfer. It also argued that most of the allegations related to the hostile work environment claim were untimely and, regardless, not severe or pervasive enough to create a hostile work environment.

The district court granted summary judgment in favor of Morgan Stanley on both claims. As to the termination claim, the district court found that Milligan had failed to provide evidence that Morgan Stanley fired her because of her sex. As to the hostile work environment claim, the district court found

that much of the alleged conduct was time barred and that the conduct that remained did not create a hostile work environment. Milligan appeals.

## II. ANALYSIS

Milligan argues that the district court erred by granting summary judgment in favor of Morgan Stanley on her discrimination and hostile work environment claims. On review, we find that summary judgment was appropriate for both. We address each in turn.

*A. Milligan is not entitled to a trial on her discrimination claim.*

To survive summary judgment on a Title VII discrimination claim, a plaintiff must present "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). We review summary judgment in Title VII cases *de novo*. *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015).

Milligan must show that a reasonable factfinder could conclude that her sex influenced Evans's decision. In an attempt to do so, Milligan argues that three facts suggest that Evans fired her because of her sex: Evans's misapplication of company policy; the firm's treatment of other employees; and the timing of her firing. Alternatively, she argues that Mitchell and Brendza caused Evans to fire her based on her sex under a cat's paw theory of discrimination. None of these arguments carries the day.

*1. Milligan presents no evidence that her sex influenced Evans's decision to fire her.*

Milligan first argues that Evans could not have fired her for her performance because she did not violate firm policy. Milligan insists that Morgan Stanley had no relevant policy or, to the extent that it did, her conduct did not violate the policy. When viewed in this light, she argues, her firing must have been influenced by her sex.

This argument falls short. At the time Milligan processed the fraudulent transition, Morgan Stanley had numerous guidelines in place to help financial advisors avoid fraud. Evans was familiar with these policies, and they formed the backdrop of his decision to fire Milligan. It is possible that Evans misunderstood the firm's policies regarding fraudulent transfer requests. It is also possible that he punished her too harshly given the sophistication of the fraudster who duped her. But this court does not act as a "superpersonnel department." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Holmes v. Potter*, 384 F.3d 356, 361 (7th Cir. 2004)). So long as Milligan's sex did not influence Evans's decision to fire her, that decision—even if made by misapplying firm policy—would not violate Title VII.

Next, Milligan points to how Morgan Stanley treated other employees who processed fraudulent transfers. She notes that Morgan Stanley did not fire other similarly situated male financial advisors after they mishandled fraudulent requests. Again, she contends that this suggests that her sex must have motivated her dismissal. Whether an employer's treatment of one employee suggests that it discriminated against another employee depends in large part on whether the two employees "engaged in similar conduct without such differentiating

or mitigating circumstances as would distinguish their con-
duct or the employer's treatment of them." *Coleman v. Do-
nahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Cater-
pillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Milligan points to how Morgan Stanley treated Vipul Shah
to argue that the firm treated male employees better than their
female coworkers. Her comparison falls short. Like Milligan,
Shah oversaw a fraudulent wire transfer. But Shah had no sig-
nificant disciplinary actions on his record, whereas Milligan
had two. Morgan Stanley's decision not to fire Shah, therefore,
sheds little light on why it fired Milligan.

By contrast, Morgan Stanley relies on how it treated Pat-
rick Lauderdale. Like Milligan, Lauderdale had a checkered
disciplinary record. And like with Milligan, Morgan Stanley
fired him after he processed a fraudulent request. If anything,
Morgan Stanley's treatment of Milligan's coworkers suggests
that the firm fired her for her job performance rather than her
sex.

Finally, Milligan argues that the timing of her firing
evinces discriminatory intent on Evans's part. In some circum-
stances, suspicious timing may reveal discriminatory intent.
*Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015). As
Milligan highlights, Evans fired Milligan only days after Bren-
dza joined her for the client meeting. But "suspicious timing
alone is rarely enough to survive summary judgment" partic-
ularly when "there are reasonable, non-suspicious explana-
tions for the timing of [the] termination." *Morgan v. SVT, LLC*,
724 F.3d 990, 998 (7th Cir. 2013). Here, there is a reasonable,
non-suspicious explanation: Evans fired Milligan at the con-
clusion of his investigation into how she handled the fraud.

*2. Milligan presents no evidence of discrimination based on Cat's Paw.*

Milligan next insists that, even if Evans himself did not fire her on the basis of her sex, Mitchell and Brendza caused him to do so by way of cat's paw, a theory that applies "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). To survive summary judgment on such a theory, the plaintiff must provide "evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013).

Milligan's cat's paw theory goes as follows. Mitchell and Brendza wanted Milligan fired either because they disliked women or worried that she might become pregnant. Then, between her mishandling of the fraudulent wire request and her dismissal, Mitchell and Brendza told Evans to fire Milligan. Finally, Evans fired Milligan in part due to Mitchell and Brendza's influence.

Even assuming Mitchell and Brendza wanted Milligan fired, Milligan presents scant evidence to show that they influenced Evans's decision. At worst, Milligan suggests that Evans, Mitchell, and Brendza *could* have met between the fraud and the firing and that the pair *could* have passed their views to Evans at such a meeting. This type of speculation, however, is insufficient for any reasonable factfinder to determine that Evans "merely serve[d] as the conduit … by which [Mitchell and Brendza] achieve[d] [their] unlawful design."

*Hill v. Potter*, 625 F.3d 998, 1002 (7th Cir. 2010) (quoting *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003)). Because Milligan presents no evidence that would allow a reasonable factfinder to find that Mitchell and Brendza influenced Evans's termination decision, her cat's paw theory fails.

*B. Milligan is not entitled to a trial on her hostile work environment claim.*

Because some of Milligan's hostile work environment allegations fall outside of the statute of limitations, our analysis proceeds in two parts. First, we determine which allegations survive the statute of limitations. Second, we ask whether the allegations that survive could prove a hostile work environment. Here, most of Milligan's allegations do not survive the statute of limitations and those that do are insufficient to show a hostile work environment.

*1. The statute of limitations restricts the allegations the court may consider as part of Milligan's hostile work environment claim.*

Milligan filed her claim with the Illinois Department of Human Rights on March 6, 2013. Thus, only conduct that occurred after May 10, 2012, falls within the statute of limitations. *See* 42 U.S.C. § 2000e-5(e)(1). The majority of the conduct that Milligan alleges falls outside of this window. The Supreme Court, however, has emphasized that hostile work environment claims by "[t]heir very nature involve[] repeated conduct" and "occur[] over a series of days or perhaps years." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, if the alleged conduct forms a single unlawful employment practice falling at least in part within the statutory period, the court may consider conduct outside the statute of

limitations as part of the hostile work environment claim. *Id*. at 117–19.

As a result, this statute of limitations does not bar the court from considering conduct that occurred "10, 15, or 20 years ago," so long as it formed a single unlawful employment practice that reached into the statutory period. *See Pruitt v. City of Chicago*, 472 F.3d 925, 928 (7th Cir. 2006). Moreover, facts such as the harassers' identities, whether they acted in concert or isolation, and whether they harassed in distinct or similar fashions are irrelevant to whether the allegations form a single unlawful practice. *See Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007). This is because the employer—not its employees—must comply with Title VII, so we look to the employer's response to allegations of misconduct rather than the contours of the misconduct itself. *See id*.

Even though the statute of limitations allows plaintiffs "to drag up ancient history, to the employer's prejudice," *Pruitt*, 472 F.3d at 927 (discussing *Morgan*, 536 U.S. 101), the length of time between incidents has been a consistent limiting factor. In *Tinner v. United Insurance Co. of America*, for instance, we refused to consider conduct that occurred outside the statute of limitations. 308 F.3d 697, 709 (7th Cir. 2002). There, the allegations described isolated incidents—some occurring more than two years apart from others—rather than continuous conduct. *Id*. We held that the large gaps between incidents prevented the allegations from forming a single employment practice. *Id*.; *see also Selan v. Kiley*, 969 F.2d 560, 567 (7th Cir. 1992).

When determining whether gaps in the alleged conduct prevent it from forming a single employment practice, we have demanded that plaintiffs provide more than speculative,

unspecific assertions. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726–727 (2004).

Here, Milligan's allegations create two broad periods of conduct: one lasting from 2003 to some point in 2009 and another lasting from some point in 2011 until Milligan's firing the following year. Milligan alleges that, during the earlier period, her coworkers harassed, criticized, and made unwanted advances towards her. Then during the later period, Mitchell commented on the revealing outfits of a CNBC anchor and Mitchell and Brendza commented on Milligan's potential pregnancy to her and her clients.

Some of these allegations fall within the statute of limitations, but most do not. Nevertheless, Milligan asks that we review all of the conduct—including what falls outside the statute of limitations—to decide her hostile work environment claim. To do so, we must find that the series of allegations describe continuous conduct rather than isolated incidents.

Milligan insists that the allegations from the earlier and later periods join to form a single employment practice because very little time separates the periods. To that end, Milligan testified that the later conduct—starting with Mitchell's comments—*probably* began in 2011. As for earlier conduct, Milligan testified that it *probably* occurred from 2003 to 2009 or 2010, though her other statements in her deposition suggest it could have ended as early as 2008.

These assertions lack the specificity necessary to show that her allegations form a single employment practice. Indeed, Milligan's own testimony suggests that the gaps between Mitchell's later comments and the earlier harassment that she faced could be as large as two or three years. Such unspecific,

speculative allegations cannot connect otherwise distant allegations into a single employment practice. *See Tinner*, 308 F.3d at 709; *Selan*, 969 F.2d at 567. Thus, we will not consider Milligan's allegations from the earlier period.

Most of Milligan's remaining allegations occurred within the May 10, 2012 statutory cutoff. Mitchell's request that Milligan plan her pregnancy around his work schedule falls within this period. The same is true for most of Mitchell's comments about the CNBC anchor and Brendza's comment at the client meeting. Mitchell's additional comments about the CNBC anchor fall outside the statute of limitations. But we consider them as well because they form a single employment practice with the other later allegations.

*2. The remaining conduct does not create a hostile work environment.*

The only allegations that survive the statute of limitations are Mitchell's comments about the news anchor, his questions and requests about Milligan's pregnancy, and Brendza's comments at the client meeting. These allegations form the challenged employment practice. And it is these allegations that the court reviews to determine if Morgan Stanley allowed Milligan's coworkers to create a hostile work environment.

To survive summary judgment on a hostile work environment claim, a plaintiff must prove four elements: "(1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's sex was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016).

Morgan Stanley contends that the conduct did not create a hostile work environment because it did not make Milligan's work environment "hellish." Ten years ago, we told litigants loud and clear that "hellishness" is not the touchstone of a hostile work environment. *Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007). Morgan Stanley's assertion to the contrary flatly ignores our case law on this point.

That said, summary judgment is appropriate here. To create a hostile work environment, the conduct alleged must be "sufficiently severe or pervasive to alter the conditions of employment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Whether conduct meets this bar depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id*.

Mitchell's and Brendza's comments fall short of this bar. *See Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 862–863 (7th Cir. 2011) (allegations that supervisor regularly called employee "cutie" and in one instance commented on her "pretty face" did not create a hostile work environment); *Scruggs*, 587 F.3d at 841 (allegations that supervisor told employee that she was "made for the back seat of a car" and looked like a "dyke" in combination with other statements did not create a hostile work environment). Milligan's allegations regarding Mitchell's conduct were her most serious. Though his conduct was pervasive, it was not physically threatening, nor did it interfere with Milligan's work performance. Milligan admitted as much in her deposition. (R. 54-1 at 176.) Milligan's allegation that Brendza made a single comment about her plans for a family does not push the conduct as a whole over that line.

Thus, no reasonable factfinder could conclude that the conduct Milligan alleged created a hostile work environment.

### III. CONCLUSION

Summary judgment is appropriate for Milligan's discrimination and hostile work environment claims. As to her discrimination claim, Milligan offers mere speculation. From that, no reasonable factfinder could find that Morgan Stanley fired her because of her sex. Milligan's hostile work environment claim fails as well. Her testimony lacks the specificity that would allow this court to consider her serious—but time-barred—allegations. And the allegations that fall within the statute of limitations are not severe or pervasive enough to create a hostile work environment.

AFFIRMED.